Cite as 2020 Ark. 210

# SUPREME COURT OF ARKANSAS

**No.** CV–19–808

| | |
|---|---|
| | **Opinion Delivered:** May 28, 2020 |
| J.R. HURD; SARA SMITH HURD; PATRICIA HURD MCGREGOR; VICTORIA HURD GOEBEL; DAVID W. KILLAM; ADRIAN KATHLEEN KILLAM; TRACY LEIGH KILLAM-DILEO; HURD ENTERPRISES, LTD.; AND KILLAM OIL CO., LTD.<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS OIL & GAS COMMISSION; LAWRENCE BENGAL, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE ARKANSAS OIL & GAS COMMISSION; W. FRANK MORLEDGE, MIKE DAVIS, LEE DAWKINS, JERRY LANGLEY, JIM PHILLIPS, CHRIS WEISER, TIMOTHY SMITH, CHARLES WOHLFORD, AND THOMAS MCWILLIAMS, IN THEIR OFFICIAL CAPACITIES AS COMMISSIONERS OF THE ARKANSAS OIL & GAS COMMISSION; AND SWN PRODUCTION (ARKANSAS), LLC<br><br>APPELLEES | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTH DIVISION [NO. 60CV-17-3961]<br><br>HONORABLE TIMOTHY DAVIS FOX, JUDGE<br><br><u>AFFIRMED</u>. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellants J.R. Hurd, Sara Smith Hurd, Patricia Hurd McGregor, Victoria Hurd

Goebel, David W. Killam, Adrian Kathleen Killam, Tracy Leigh Killam–Dileo (collectively,

"the Hurds and the Killams"); Hurd Enterprises, Ltd.; and Killam Oil Co., Ltd., appeal from the Pulaski County Circuit Court's order affirming the amended integration orders entered by appellee Arkansas Oil & Gas Commission (the "AOGC"). For reversal, appellants argue that the AOGC exceeded its statutory authority in granting the request by appellee SWN Production (Arkansas), LLC ("SWN"), to reduce the royalty payable under appellants' oil-and-gas leases when the lessees elected to go "non-consent." We affirm.

This case arose from a dispute between SWN, which operates the two gas units at issue, and the Hurds and the Killams, who are the mineral lessors, over the royalty payable under appellants' oil-and-gas leases. The Hurds and the Killams own mineral interests in Sections 25 and 36, Township 9 North, Range 11 West in Cleburne County. In October 2004 and May 2010, they leased these interests to SEECO, Inc., for a 20 percent and a 25 percent royalty, respectively. They also had "Pugh Clauses" requiring SEECO to release the leases for nonproducing depths after the primary term. In June and August 2010, at SEECO's request, the AOGC integrated drilling units in Sections 25 and 36 to produce gas from the Fayetteville Shale formation. Through their SEECO leases, the Hurds' and the Killams' interests in Sections 25 and 36 became part of these two units. In November 2010 and May 2014, as required by the Pugh Clauses, SEECO released the Hurds' and the Killams' leases for all formations below the Fayetteville Shale. Their leases continued in effect for their interests in and above the Fayetteville Shale because SEECO was still producing from that formation.

On February 2, 2017, SEECO's successor, SWN, asked the AOGC to integrate two units, one in Section 25 and one in Section 36, for the purpose of drilling a cross-unit

natural-gas well in a geologic formation called the Moorefield Shale, which lies below the Fayetteville Shale.[1] These applications by SWN became AOGC docket numbers 007-2017-02 (for Section 36) and 008-2017-02 (for Section 25). SWN offered the royalty owners and other unleased mineral owners either (1) a $100/acre bonus and a one-eighth royalty or (2) a $0/acre bonus and a one-seventh royalty.

After learning of the integration applications by SWN, the Hurds leased their interests in Sections 25 and 36 to Hurd Enterprises, and the Killams leased their interests to Killam Oil. Each of these leases provided for a 25 percent (or one-fourth) royalty to the lessor. On February 22, 2017, the AOGC heard SWN's applications. SWN indicated at the hearing that it had recently learned of the Hurds' and the Killams' leases, although it was not yet aware of the precise terms. SWN requested permission to return and have the AOGC make a determination as to the reasonableness of the royalty rate that SWN, as the operator, could potentially be responsible for paying if the lessees were to elect not to participate in the costs of the well.

The AOGC granted SWN's applications and issued two integration orders on March 6, 2017. These orders contained a "Joint Operating Agreement" that approved SWN as the operator of the units. In addition, there were provisions that allowed a period of time for the unleased mineral-interest owners and any uncommitted leasehold working-interest owners to either participate in the costs of completing and operating the proposed well or

---

[1]As we explained in *Gawenis v. Arkansas Oil & Gas Commission*, 2015 Ark. 238, 464 S.W.3d 453, an integration order forces all interest owners in a specific geographic area to pool their interests and allows one operator (the applicant) to drill the area for the sharing of production from the unit.

to go "non-consent."[2] Owners that choose to go non-consent would not have to pay any upfront costs for the well, but their share of production from the well would be transferred to the "consenting parties" who had agreed to participate in the well. This transferred working-interest share of production would then be applied to pay the non-consenting parties' proportionate share of the completion and operational costs for the well, plus an additional risk penalty. After these sums were paid (the "recoupment period"), the non-consenting owners would begin receiving revenue from the well's production. The integration orders further provided that the leasehold royalty would be paid during the recoupment period according to the provisions of the leases existing for each separately owned tract, except where the AOGC found "that such lease(s) provide for an excessive, unreasonably high, rate of royalty as compared with the royalty determined by the Commission to be reasonable and consistent with the royalty negotiated for lease(s) made at arm's length in the general area where the Unit is located[.]"

On March 8, 2017, SWN filed supplemental applications with the AOGC for Sections 25 and 36. SWN stated that it expected the Hurds and the Killams to elect to go non-consent. It further alleged that the 25 percent royalty rate set forth in appellants' February 2017 leases was unreasonable and was artificially inflated due to the Hurds' and the Killams' self-dealing with their own oil-and-gas companies. SWN asked the AOGC to determine a reasonable royalty rate. Hurd Enterprises and Killam Oil then notified SWN of

---

[2]Because SWN was not yet aware of the Hurds' and the Killams' leases to Hurd Enterprises and Killam Oil at the time of its application to the AOGC, the March 6, 2017 integration orders identify the Hurds and the Killams as "unleased mineral interests" to be integrated, and there are no parties identified as "uncommitted leasehold working interests" in those orders.

4

their election to go non-consent and objected to the supplemental applications. They argued that SWN's request was contrary to statutory law, outside the AOGC's jurisdiction, and contrary to the March 6 integration orders.

The AOGC heard evidence on the supplemental applications on May 23, 2017, and held an adjudication hearing on June 27. At the hearings, SWN presented evidence that gas prices had declined since 2010, that SWN was the only company taking Moorefield-only leases, and that the highest bonus and royalty paid for Moorefield-only interests in Sections 25 and 36 was what SWN had offered the Hurds and the Killams and other unleased mineral owners—a $100/acre bonus and a one-eighth royalty, or a $0/acre bonus and a one-seventh royalty. The Hurds and the Killams, however, argued that a 20–25 percent royalty was reasonable given the proposed well's estimated production and the recoverable reserve.

On July 18 and 20, 2017, the AOGC issued amended and supplemental orders finding that it had the authority and jurisdiction to consider SWN's supplemental applications and that the 25 percent royalty rate set in the February 2017 leases was excessive and unreasonably high compared to royalties negotiated for leases made at arm's length in the general area where the unit is located. The AOGC ordered that the leasehold royalty rate payable to the Hurds and the Killams during the recoupment period was not to exceed one-seventh and amended the "Joint Operating Agreement" accordingly.

Appellants filed a petition for review in the Pulaski County Circuit Court pursuant to the Arkansas Administrative Procedure Act ("APA").[3] They claimed that the AOGC's

---

[3]The petition for review also named the Director of AOGC, Lawrence Bengal; and the Commissioners of AOGC, W. Frank Morledge, Mike Davis, Lee Dawkins, Jerry

supplemental integration orders were (1) in violation of statutory provisions; (2) in excess of the AOGC's statutory authority; (3) made upon unlawful procedure; and (4) arbitrary, capricious, and characterized by an abuse of discretion.

SWN and the AOGC responded that the governing statutes provide clear authority for the AOGC to set reasonable royalty rates. The AOGC also filed a motion to dismiss the petition for review, claiming that it had sovereign immunity from suit pursuant to this court's decision in *Board of Trustees of the University of Arkansas v. Andrews*, 2018 Ark. 12, 535 S.W.3d 616. The circuit court agreed that sovereign immunity applied and dismissed the petition in an order entered on February 12, 2018. On appeal, we held that sovereign immunity did not bar the petition for review, and we reversed and remanded for the circuit court to consider the merits of the petition. *Ark. Oil & Gas Comm'n v. Hurd*, 2018 Ark. 397, 564 S.W.3d 248.

Following a hearing on remand, the circuit court entered an order on July 16, 2019, affirming the AOGC's orders. Appellants filed a timely notice of appeal, and the case is once again before us. In their sole point on appeal, appellants argue that the AOGC exceeded its statutory authority in granting SWN's request to reduce the royalty payable under appellants' oil-and-gas leases when the lessees elected to go "non-consent." They contend that the AOGC's actions were both ultra vires and arbitrary and capricious and that we should reverse its decisions to grant the supplemental applications.

---

Langley, Jim Phillips, Chris Weiser, Timothy Smith, Charles Wohlford, and Thomas McWilliams, in their official capacities.

6

Our review on appeal is directed toward the decision of the administrative agency, rather than the decision of the circuit court. *Great Lakes Chem. Corp. v. Bruner*, 368 Ark. 74, 243 S.W.3d 285 (2006). As with all appeals from administrative decisions under the APA, either the circuit court or the appellate court may reverse the agency decision if it concludes that the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error or law; (5) not supported by substantial evidence of record; or (6) arbitrary, capricious, or characterized by abuse of discretion. *Gildehaus v. Ark. Alcoholic Beverage Control Bd.*, 2016 Ark. 414, 503 S.W.3d 789; Ark. Code Ann. § 25-15-212(h) (Supp. 2019).

Appellants do not dispute that the March 2017 integration orders contain a clause specifically allowing the AOGC to reduce the leasehold royalty rate when the lease provides for "an excessive, unreasonably high, rate of royalty, as compared with the royalty determined by the Commission to be reasonable and consistent with the royalty negotiated for lease(s) made at arm's length in the general area where the Unit is located." Rather, appellants argue that the AOGC lacks the statutory authority to include or enforce such a clause. Accordingly, the issue raised on appeal is strictly one of statutory interpretation.

As an initial matter, appellants challenge this court's practice of giving deference to an administrative agency's interpretation of a statute, claiming that this conflicts with the constitutional doctrine of separation of powers. However, we recently addressed this issue

7

in *Myers v. Yamato Kogyo Co., Ltd.*, 2020 Ark. 135, at 3, 597 S.W.3d 613, 616, and set forth

the applicable standard of review:

> [W]e clarify today that agency interpretations of statutes will be reviewed de novo. After all, it is the province and duty of this Court to determine what a statute means. *See Farris v. Express Servs., Inc.*, 2019 Ark. 141, at 3, 572 S.W.3d 863, 866. In considering the meaning and effect of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id*. An unambiguous statute will be interpreted based solely on the clear meaning of the text. But where ambiguity exists, the agency's interpretation will be one of our many tools used to provide guidance.

Because we apply this standard to the statutes involved here, there is no need to further

discuss appellants' argument in this regard.

SWN and the AOGC cite two statutes that they contend authorize the agency's

decision to reduce the royalty rates payable under the oil-and-gas leases in this case. First,

Arkansas Code Annotated section 15-71-110(a)(1) (Supp. 2019) provides that "[t]he Oil

and Gas Commission shall have jurisdiction of and authority over all persons and property

necessary to administer and enforce effectively the provisions of this act and all other

statutory authority of the commission relating to the exploration, production, and

conservation of oil and gas." Second, Arkansas Code Annotated section 15-72-304(a) (Supp.

2019), which governs integration orders, states that

> [a]ll orders requiring integration shall be made after notice and an opportunity for a hearing and shall be upon terms and conditions that are just and reasonable and that will afford the owner of each tract or interest in the drilling unit the opportunity to recover or receive his or her just and equitable share of the oil and gas in the pool without unnecessary expense and will prevent or minimize reasonably avoidable drainage from each developed unit which is not equalized by counter drainage.

8

SWN and the AOGC assert that the language in this statute providing that integration orders "shall be upon terms and conditions that are just and reasonable" gives the AOGC the authority to determine reasonable royalty rates and to reduce the rates in accordance with the provisions in its integration orders where the leasehold rates are excessive.

We find that, in addition to the plenary authority granted to the AOGC under section 15-71-110(a)(1), the clear and unambiguous language in section 15-72-304(a) explicitly authorizes the AOGC to ensure that all integration orders are upon terms that are "just and reasonable" and that will afford each owner the opportunity to receive "his or her just and equitable share . . . without unnecessary expense." While there is no statutory provision specifically stating that the AOGC may reduce the royalty rate contained in a lease, there is also no statutory language expressly stating that the consenting parties, such as SWN, are responsible for payment of royalties when an uncommitted leasehold working-interest owner, such as Hurd Enterprises or Killam Oil, elects to go non-consent. Section 15-72-304(c)(3) discusses the transfer of "rights" in the drilling unit to the consenting parties in such a scenario but not the transfer of obligations. Instead, these types of detailed provisions are generally found in the terms of the integration order itself or in the joint operating agreement that is incorporated into each order. As SWN argued below, it would be impracticable for statutes to cover every possible situation that an agency may encounter when carrying out its statutory duties. We have held that "[s]tate agencies possess such powers as are conferred by statute *or are necessarily implied from a statute*." *Walker v. Ark. State Bd. of Educ.*, 2010 Ark. 277, at 20–21, 365 S.W.3d 899, 911 (emphasis added).

9

Appellants cite our decision in *Dobson v. Arkansas Oil & Gas Commission*, 218 Ark. 160, 235 S.W.2d 33 (1950), in support of their argument that the AOGC may only act under direct statutory authority. However, in *Dobson*, we held that the agency could not compel the unitization of an entire oil and gas field when there was no statute in existence at that time empowering it to do so. *Id*. Here, Arkansas Code Annotated section 15-72-304 expressly authorizes the AOGC not only to enter integration orders but also to ensure that they are on just and reasonable terms. Thus, the present case is clearly distinguishable from *Dobson*.

SWN and the AOGC further demonstrate the fallacy of appellants' position by providing an example of a lease between affiliated parties that contains an even higher royalty rate, such as a royalty of seven-eighths. Appellants argued in their brief below that they would not oppose the AOGC's "disregarding such an obvious fiction," and they claim that this extreme example does not justify the agency's "legal overreach." However, as the AOGC asserts, it either has the statutory power to determine what is just and reasonable, or it does not. If appellants' argument was correct, the AOGC would be powerless to act even in extreme cases like the one cited above.

Appellants also contend that the AOGC's supplemental orders were arbitrary and unreasonable because they set the maximum royalty rate of one-seventh for "non-arm[']s-length" leases only and because there were other arm's-length leases in the general area with higher royalty rates. However, these arguments relate to the AOGC's factual determinations, which appellants concede they are not challenging. As discussed above, the

AOGC's actions were authorized by statute. Accordingly, we conclude that the supplemental orders were neither ultra vires nor arbitrary or capricious, and we affirm.

Affirmed.

KEMP, C.J., and BAKER and HART, JJ., dissent.

**KAREN R. BAKER, Justice, dissenting.** I dissent from the majority opinion and would dismiss this appeal for the reasons stated in my dissent in *Arkansas Oil & Gas Commission v. Hurd*, 2018 Ark. 397, at 17, 564 S.W.3d 248, 258.

**JOSEPHINE LINKER HART, Justice, dissenting.** I dissent. The majority's interpretation of Ark. Code Ann. § 15-72-304 grants the Arkansas Oil and Gas Commission (AOGC) authority it simply does not have. AOGC exists to facilitate safe and sustainable production of natural resources, not to settle purely private business negotiations or to serve as a tribunal therefor. Moreover, the evidence in the record does not support AOGC's determination that the Hurds' and the Killams' lease agreements, which contain a 25 percent royalty provision, are unreasonable or otherwise justify government intervention. Instead, the record reflects that SWN presented the Hurds and the Killams with what they considered a low-ball offer, so the Hurds and the Killams took steps to protect their financial interests within their existing course of business with SWN. AOGC's order should be reversed.

First, understand that the Arkansas Oil and Gas Commission's role is one of equitable necessity. Such regulatory bodies were conceived in response to increasingly apparent shortcomings of the common law's "rule of capture." The following excerpt aptly sets out the development of these concerns:

11

Oil and gas are fugacious minerals. Thus, their ownership is governed by the ancient common law rule of capture. The rule of capture has long been a part of Arkansas law. In the 1912 case of *Osborn v. Arkansas Territorial Oil & Gas Co.*, [103 Ark. 175, 180, 146 S.W. 122, 124 (1912)] the Arkansas Supreme Court, quoting an earlier United States Supreme Court decision, stated:

> Petroleum, gas, and oil are substances of a peculiar character. . . . They belong to the owner of land, and are part of it so long as they are part of it or in it or subject to his control; but, when they escape and go into other land or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas extending under his neighbor's field, so that it comes into his well, it becomes his property.

> More simply stated, every well owner has a legal right to keep everything his well can produce as long as it does not physically cross over onto a neighboring tract. But as a corollary, the neighbor also has a legal right to drill his own wells and capture oil and gas.

> The trouble is that the rule of capture, left to run amuck in this fashion, leads to a pretty dreadful end. Competition among drillers for limited oil and gas reserves inevitably led to an intolerable situation […] Not only were far more wells drilled than were needed to produce the recoverable oil, excessively rapid production actually damaged the underground reservoir, reducing the ultimate recovery and causing large amounts of oil to be lost forever. Of even greater concern to the industry was the resultant glut of oil, which led to a freefall in its price.

Thomas A. Daily, *Rules Done Right: How Arkansas Brought Its Oil and Gas Law into a Horizontal World*, 68 Ark. L. Rev. 259, 261–62 (2015).

Indeed, the nature of market competition in such an explorative industry made government involvement all but inevitable. Daily's law review article also quoted Daniel Yergin's historical account, *The Prize: The Epic Quest for Oil, Money, and Power*, which observed as follows:

> But who would control production? Was it to be done voluntarily or under the government's aegis? By the Federal government or by the states? Even

within individual companies there were sharp debates. A major split developed within Jersey Standard, with Teagle in favor of voluntary control, while Farish, the head of the Humble subsidiary, concluded that the government had to be involved. "The industry is powerless to help itself," Farish wrote to Teagle in 1927. "We must have government help, permission to do things we cannot do today, and perhaps government prohibition of those things (such as waste of gas) that we are doing today." When Teagle suggested that "practical men" from the industry should develop a program of voluntary self-regulation, Farish replied sharply, "There is no one in the industry today who has sense enough or knows enough about it to work out this plan." He added, "I have come to the conclusion that there are more individual fools in the petroleum industry than in any other business."

Yergin, *supra* at 206 (quoting various authorities).

Hence, government regulation. In 1939, Arkansas passed its own "Conservation Act," which created the Arkansas Oil and Gas Commission. Acts of 1939, Act 105, § 2. AOGC was created by an act of the legislature, providing that the commission's members are to be appointed by the governor. *Id*. Section 1 of the Conservation Act described its purpose as follows:

> DECLARATION OF POLICY: In recognition of past, present, and imminent evils occurring in the production and use of oil and gas, as a result of waste in the production and use thereof in the absence of co-equal or correlative rights of owners of crude oil or natural gas in a common source of supply to produce and use the same, this law is enacted for the protection of public and private interests against such evils by prohibiting waste and compelling ratable production.

These laws confer jurisdiction and authority upon AOGC to address all manner of practical issues related to production measurement and waste prevention, including the identification of well ownership, implementation and disposal of equipment and production facilities, managing wells to prevent escape of resources, pollution, and intrusion of water, etc. *See* Ark. Code Ann. § 15-71-110.

13

Note that all these laws must be implemented and interpreted in accord with the Arkansas Constitution, which closely guards the people's property rights. "The right of property is before and higher than any constitutional sanction; and private property shall not be taken, appropriated or damaged for public use, without just compensation therefor." Ark. Const. art. 2, § 22. "No bill of attainder, ex post facto law, or *law impairing the obligation of contracts shall ever be passed*; and no conviction shall work corruption of blood or forfeiture of estate." *Id*. art. 2, § 17 (emphasis added). "The State's ancient *right of eminent domain* and of taxation, is herein fully and expressly conceded; and the General Assembly may delegate the taxing power, with the necessary restriction, to the State's subordinate political and municipal corporations, to the extent of providing for their existence, maintenance and well being, *but no further*." *Id*. art. 2, § 23 (emphasis added).

The Arkansas Constitution also prohibits giving particular individuals or entities special treatment, especially when that treatment would be properly afforded by a court of law, where judges are elected and juries decide facts. Article 2, section 18 dictates that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Furthermore, "[n]o person shall be taken, or imprisoned, or *disseized of his estate*, freehold, liberties or privileges; or outlawed, or in any manner destroyed, or deprived of his life, liberty or *property*; except by the *judgment of his peers*, or *the law of the land*; nor shall any person, under any circumstances, be exiled from the State." Art. 2, § 21 (emphasis added). Finally, article 5, section 25 provides that "[i]n all cases where a general law can be made applicable, no special law shall be enacted; nor shall the operation of any general law be suspended by the

14

legislature *for the benefit of any particular individual, corporation or association*; nor *where the courts have jurisdiction to grant the powers, or the privileges, or the relief asked for*." (Emphasis added.)

To sum up, the rationale behind having a regulatory body like AOGC is to prevent waste and to ensure that all interested landowners have a seat at the table. This involves developing production plans that will generate sustainable yields, as well as providing a forum where differences of opinion regarding those plans may be resolved. AOGC does not have authority to compel or entertain requests for what would amount to a taking, or other such relief that would be properly issued by a court of law. Put simply, AOGC's role is to facilitate safe and sustainable production of shared natural resources.

With these principles in mind, let us turn to the statute where the majority finds authority for AOGC's actions in this case. Arkansas Code Annotated section 15-72-304(a) provides as follows:

> All orders requiring integration shall be made after notice and an opportunity for a hearing and *shall be upon terms and conditions that are just and reasonable* and that will afford the owner of each tract or interest in the drilling unit the opportunity to recover or receive his or her just and equitable share of the oil and gas in the pool without unnecessary expense and will prevent or minimize reasonably avoidable drainage from each developed unit which is not equalized by counter drainage.

(Emphasis added.) The majority contends that the emphasized language above gives AOGC authority to disregard the royalty provisions contained in the Hurds' and the Killams' lease agreements and replace those provisions with what AOGC feels is a reasonable royalty rate.

The majority mistakes the role of the AOGC. The role of AOGC does not, and should not, involve deciding the winner of purely private business negotiations between the real parties in interest (in this instance, the Hurds, the Killams, and SWN)—i.e., the ones

15

who actually provide the means for whatever production plan AOGC ultimately implements. The rate for a royalty provision contained in a mineral lease agreement is one of an untold number of considerations factoring into the reasonableness of the overall contract. Many of those considerations will be tied to the particular situation each party is in at the time of the negotiations. Arkansas Code Annotated section 15-72-304's requirement that integration orders be issued "upon terms and conditions that are just and reasonable" refers to AOGC's responsibility to prevent waste and ensure ratable production of shared geological resources—it does not create some government authority to disregard purely private business negotiations or to substitute its own judgement therefor. AOGC cannot, through a misinterpretation of a statute and ignorance of our constitution, force the Hurds and the Killams to give up their resources for less than they believe they are worth because it amounts to government appropriation of their property, i.e., a taking.

Moreover, SWN was aware that the Hurds' and the Killams' leases to their own entities existed at the time it obtained its order for integration, which provided that leasehold royalty interests would be paid pursuant to the terms in the leases. Then, AOGC issued a supplemental order providing that no leasehold royalty interest higher than 1/7 would be honored on non-arm's-length transactions. What makes it any different after the fact than before the fact? The only difference is that SWN complained. AOGC cannot be seen as a springboard for a party like SWN to attack leasehold royalty rates that are higher than it wishes to pay.

If AOGC can disregard the royalty rate contained in the Hurds' and the Killams' leases, then it can also disregard the royalty provisions in the existing leases with other

16

mineral-interest holders in the Fayetteville Shale area. The Hurds' and the Killams' interests in the Moorefield depths were unleased because their prior lease with SWN contained a Pugh clause. Other existing leases in the Fayetteville Shale did not contain a Pugh clause releasing the Moorefield depths, and some of those leases contain royalty rates as high as 20 percent or more. SWN is honoring these leases for the Moorefield depths. These facts illuminate the disparate treatment of the Hurds and the Killams. The findings of fact contained in AOGC's order do not address the royalty rates being paid pursuant to the Fayetteville Shale leases.

What's more is that these decisions are placed in the hands of individuals who are appointed to AOGC by the governor, who does not have power under either these statutes or the constitution to act as an elected judge would in an eminent domain proceeding. This is not what the legislature intended when it provided that integration orders shall be "upon terms and conditions that are just and reasonable." Ark. Code Ann. § 15-72-304. The majority's interpretation disregards AOGC's intended role and relieves operators of any reason to negotiate with the landowners. One nominally extended low-ball offer would not amount to legitimate negotiation. Allowing AOGC to endorse and implement either party's conception of a reasonable royalty rate transforms AOGC's role from that of a neutral business facilitator to that of a czar with authority to dictate which players in the industry get the biggest share of revenue. Such involvement exceeds AOGC's role and authority, as set forth in the statutes and constitutional provisions above. SWN needs to deal with the Hurds and the Killams, not AOGC.

If there was any need for illustrating the unworkability of allowing AOGC to substitute what it considers a reasonable royalty rate in private parties' existing leases, this case's own facts provide a clear example. Put simply, what makes the royalty provision contained in the Hurds' and Killams' leases unreasonable? The majority justifies its position by characterizing the Hurds' and Killams' leases as "non-arms-length" transactions, but that characterization grossly oversimplifies this matter.

The evidence in the record reflects that the Hurds and the Killams have been leasing to SWN (formerly SEECO, Inc., now Flywheel Energy Production, LLC) since at least 2004. The various terms contained in each mineral lease agreement differ significantly. But even narrowing the consideration to just the terms for royalty rate and bonus-per-acre from those leases, we see terms as high as a 25 percent royalty with a $1,500 bonus-per-acre to as low as a 16.67 percent royalty with a $1,000 bonus-per-acre. In fact, the family's prior lease that released the Moorefield depths had provided for a 23 percent royalty for mineral interests in the Fayetteville Shale. So, as an initial matter, note that the relative terms contained in the lease agreements at issue here (a 25 percent royalty with a $0 bonus-per-acre) are within the range of those prior agreements. Moreover, SWN knew the royalty rate in the family's leases when it obtained the integration order. It was in place when the first order was entered. Assuming without deciding that 25 percent is excessive, that fact was known before SWN obtained its integration order.

But of course, it's more complicated than that. SWN had offered the Hurds and the Killams either a one-eighth royalty with a $100 bonus-per-acre, or a one-seventh royalty with no bonus-per-acre. This offer was apparently rejected. SWN contends that its offer

18

represented what a reasonable market royalty would be, since this was what the other Moorefield-only mineral interest holders had leased for. SWN did acknowledge below that it has other pre-existing leasehold interests that would cover the Moorefield development and which contained a 20 percent provision (with a "large bonus"), and that the terms contained in those leases are being honored. Still, SWN alleged that several factors now warranted a lower rate, such as lower fuel prices, fewer active drilling rigs in the area, and that SWN was "the only party seeking Moorefield-only leases."[4]

However, the Hurds and the Killams saw the situation quite differently. One-seventh with no bonus or one-eighth with a bonus was "[not] even close" to market value for the Hurds' and the Killams' interests, according to J.R. Hurd, chairman for the families' businesses who testified at the hearing below. He recounted that the Hurds' and the Killams' interests represented more than 20 percent of the overall unit, maintaining that larger tracts generally get higher royalty rates than smaller tracts. Hurd also pointed out that while SWN did file for this integration with AOGC, SWN did not disclose logs, test results, or much other information to the Hurds and the Killams regarding the expected production from this venture when SWN extended its offer.

As stated above, however, even without the Hurds and the Killams having agreed to terms, SWN filed for integration with AOGC. The Hurds and the Killams, at that point in a tenuous position, responded by leasing those interests to their own entities for a 25 percent

---

[4]The evidence entered below reflects that the sales price for these resources fluctuates on a daily basis, and mineral leases contemplate that the sales price will fluctuate. Moreover, SWN's self-serving valuation of the family's mineral interests has no more evidentiary value than the family's self-serving valuation.

royalty with zero bonus per acre, and electing to go non-consent. It seems the purpose of this maneuver was to "lock in" what they considered a reasonable royalty rate for the use of their property, since SWN had only offered little more than the minimum 1/8 statutory default royalty, which would have been applied to the family's mineral interests if they had remained unleased when the unit was created. Ark. Code Ann. § 15-72-305(a)(1). Based upon the evidence, it appears that the Hurds and the Killams took these steps to protect their families' financial interests, considering the lack of information about the prospective venture, the fact that some of the family business's owners have mineral interests and some do not, and that the family is in the oil and gas business for "the long haul." In light of these circumstances, the family maintained that a 25 percent royalty with zero bonus per acre was a reasonable valuation of the family's mineral interests.

SWN, unhappy with the family's maneuver, requested that AOGC disregard and replace the royalty rate contained in the family's leases with what SWN had offered the family previously. AOGC obliged, and the Hurds and the Killams appealed. This entire dispute stems from the discrepancy between the term for a 25 percent royalty with $0 bonus-per-acre contained in the family's leases and the term for 1/7 or 1/8 royalty with $100 bonus-per-acre offered by SWN.

SWN maintains that other mineral interest holders (whom we essentially know nothing about from the record) in a similar position to the Hurds and the Killams agreed to its proposed terms, but this is of no moment. Each deal is different. Those other leases pertained to those parties, their land, and their mineral interests. Moreover, if there was no one else taking Moorefield-only leases, then perhaps those other mineral interest holders are

the ones who entered into unreasonable deals with SWN, and the Hurds and the Killams simply knew better? Such considerations require flexibility, accounting for market status and the particular circumstances of the parties involved—and are ill-suited for the standards and consistency demanded of good government. The legislature did not give AOGC authority to dictate purely private business negotiations, and even if it had, AOGC's decision to do so in this instance is arbitrary and without a clear evidentiary basis. The majority's misinterpretation of our oil and gas laws violates the rules of statutory construction and is unconstitutional as applied to the Hurds and the Killams.

I dissent.

KEMP, C.J., joins this opinion.

*Friday, Eldredge & Clark, LLP*, by: *William A. Waddell, Jr.*, *Robert S. Shafer*, and *Joshua C. Ashley*; and *Morgan Law Firm, P.A.*, by: *M. Edward Morgan*, for appellants.

*Shane E. Khoury*, Chief Counsel, *Alan J. York*, Associate Chief Counsel, and *Madison Pitts*, Att'y, for appellee Arkansas Oil & Gas Commission.

*PPGMR LAW, PLLC*, by: *G. Alan Perkins* and *Kimberly D. Logue*, for appellee SWN Production (Arkansas.)